STATE OF NORTH CAROLINA v. ERNEST PAUL McCARVER

No. 384A92

(Filed 8 September 1995)

**1. Jury §§ 119, 145 (NCI4th)— capital trial—jury selection— views about psychological testimony—exclusion of question—peremptory challenge—absence of prejudice—questioning of other jurors not chilled**

Defendant was not prejudiced when the trial court sustained the State's objection to defense counsel's question to a prospective juror in a capital trial as to whether he could consider psychological testimony as mitigating where defendant peremptorily challenged the juror and did not exhaust his peremptory challenges. Moreover, the trial court's ruling did not chill defendant's subsequent inquiry as to jurors' attitudes about psychological testimony where the record indicates that defendant was permitted

to question at least five other potential jurors about psychological evidence, and four of the five jurors were questioned after defendant used his peremptory challenge to excuse this juror.

**Am Jur 2d, Jury §§ 199, 210.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Effect of accused's federal constitutional rights on scope of voir dire examination of prospective jurors— Supreme Court cases. 114 L. Ed. 2d 763.**

2. **Constitutional Law § 343 (NCI4th)— capital trial—special venire—excusal and deferral of jurors by district court— no right to presence by defendant**

Defendant's constitutional and statutory rights were not violated when a district court judge excused and deferred persons selected for a special venire chosen specifically for defendant's capital trial outside the presence of defendant and his counsel since the pretrial screening process delegated to the district court by N.C.G.S. § 9-6(b) is not a part of the capital trial, and defendant's capital trial had not commenced and his unwaivable right to be present had not attached at the time the district court excused and deferred the prospective jurors.

**Am Jur 2d, Criminal Law §§ 695, 914.**

3. **Criminal Law § 456 (NCI4th); Jury § 64 (NCI4th)— capital trial—informing jury of previous trial—no denial of fair trial**

The prosecutor's statement during the jury selection process in a capital trial that "there has been a previous trial of this matter" did not tend to diminish the jurors' sense of responsibility for their verdict by suggesting that the verdict might be reviewed and thus did not deny defendant his right to a fair trial where the prosecutor's statement was made without elaboration as to how the new trial came about and with no comment on the result of the prior trial.

**Am Jur 2d, Jury § 280; Trial § 574.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial**

**violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

4. **Jury § 36 (NCI4th)— capital trial—rescission of order for special venire—no denial of constitutional or statutory rights**

The trial court's rescission of its prior order which required that a special venire be summoned in Mecklenburg County to try defendant's capital case did not violate defendant's constitutional rights to a fair trial, due process and freedom from cruel and unusual punishment or his statutory right to a complete recordation of the proceedings in a capital case where the court rescinded its order because administrative support and physical facilities were not available in Mecklenburg County due to the trial of another capital case; defendant did not have an unwaivable right of presence at the jury selection proceedings which took place prior to his case being called for trial; and there is no indication that defendant ever requested that pretrial matters be recorded.

**Am Jur 2d, Jury § 113.**

5. **Criminal Law § 113 (NCI4th)— violation of discovery order—denial of mistrial, new capital sentencing hearing**

The trial court did not abuse its discretion in denying defendant's motion for a mistrial in his first-degree murder trial based on the State's violation of a discovery order by failing to furnish to defendant a written statement from defendant's brother to a police officer that related to defendant's belief that the victim was responsible for defendant's parole being revoked where the prosecutor discovered the existence of the statement only a day before seeking to use it at defendant's capital sentencing hearing, since the prosecution's conduct did not amount to such a serious impropriety as to make it impossible for defendant to receive a fair and impartial verdict. Furthermore, the trial court did not err in the denial of defendant's motion for a new capital sentencing hearing because the prosecutor asked defendant's brother about the statement during cross-examination at the sentencing hearing where the trial court sustained defendant's objection and instructed the jury to disregard any reference to the statement.

**Am Jur 2d, Depositions and Discovery §§ 426, 427.**

**Exclusion of evidence in state criminal action for failure of prosecution to comply with discovery requirements**

as to statements made by defendants or other nonexpert witnesses—modern cases. 33 ALR4th 301.

6. **Constitutional Law § 313 (NCI4th)— no impasse between defendant and counsel—no tactical decisions contrary to defendant's wishes**

The record in this capital trial does not show "an absolute impasse" between defendant and his defense team concerning trial tactics and that the trial court allowed defense counsel to make important tactical decisions that were contrary to defendant's wishes where defendant asked to speak to the court outside the presence of the jury; defendant then consulted privately with defense counsel, who thereafter stated that defendant "will not speak"; defense counsel then indicated that defendant's mental state was such that counsel was concerned that defendant might walk out of the proceeding and delay its progression; defense counsel informed the court that counsel "will not let [defendant] run this case" and that defendant "does not control the defense, he can make suggestions"; and at no time did defendant voice any complaints to the trial court as to the tactics of his defense counsel.

**Am Jur 2d, Criminal Law §§ 752, 985-987.**

7. **Criminal Law § 793 (NCI4th); Homicide § 583 (NCI4th)— instructions—acting in concert—mens rea**

The trial court's instructions in a first-degree murder case did not allow the jury to apply the principle of acting in concert to convict defendant of specific intent crimes, including the underlying felony supporting felony murder, if it found that another perpetrator had the requisite *mens rea* to commit them. Rather, the instructions as a whole made it clear that defendant could have acted either alone or with another to commit the felony and that, in order to convict defendant, defendant himself must have had the requisite *mens rea*.

**Am Jur 2d, Homicide § 507; Trial § 1255.**

8. **Homicide § 493 (NCI4th)— instructions—premeditation and deliberation—inference from lack of provocation—no expression of opinion—supporting evidence**

The trial court's instruction that premeditation and deliberation may be inferred from a lack of provocation did not constitute an improper expression of opinion that the absence of provoca-

STATE v. McCARVER

[341 N.C. 364 (1995)]

tion had been proven. Furthermore, this instruction was supported by the evidence tending to show that the victim was going about his ordinary duties at a cafeteria when he was accosted by defendant and his companion, grabbed by the neck, choked, thrown to the floor, and then stabbed to death.

**Am Jur 2d, Homicide § 501.**

**Homicide: presumption of deliberation or·premeditation from the fact of killing. 86 ALR2d 656.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

9. **Criminal Law § 1329 (NCI4th)— capital sentencing—outcome determinative issues—unanimous "yes" or "no" answers**

Any issue which is outcome determinative as to the sentence a defendant in a capital trial will receive—whether death or life imprisonment—must be answered unanimously by the jury; that is, the jury should answer Issues One, Three, and Four on the standard form used in capital sentencing proceedings either unanimously "yes" or unanimously "no." The requirement of jury unanimity for either "yes" or "no" answers for Issues One, Three, and Four ensures that the jury properly fulfills its duty to deliberate *genuinely* for a reasonable period of time in its efforts to exercise guided discretion in reaching a unanimous sentencing recommendation, as required by the Constitution of North Carolina and by our death penalty statute. Therefore, the trial court did not err by refusing to instruct the jury to answer "no" to Issue Three, thus recommending a sentence of life imprisonment, if it could not unanimously agree as to whether the mitigators were sufficient to outweigh the aggravators and by orally informing the jury in response to its inquiry that it must be unanimous before answering either "yes" or "no" to Issue Three.

**Am Jur 2d, Criminal Law § 609; Trial §§ 1753, 1760.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

10. **Criminal Law § 1329 (NCI4th)— capital sentencing—misleading issues form—harmless error**

Assuming that Issue Three on the form used in this capital sentencing proceeding and the trial court's initial instructions could be interpreted as improperly directing the jury to answer "no" to Issue Three if unable to reach unanimity, this error was harmless beyond a reasonable doubt because it was favorable to the defendant.

**Am Jur 2d, Appellate Review § 743; Criminal Law § 609; Trial §§ 1753, 1760.**

11. **Criminal Law § 1321 (NCI4th)— capital sentencing— inability to reach unanimous verdict—instruction not required**

Questions by the jury after it had begun deliberations in a capital sentencing proceeding did not constitute an inquiry as to what the result would be if the jury failed to reach a unanimous decision but merely sought guidance as to the procedure for giving an answer to Issue Three because the printed Issues and Recommendation as to Punishment form could be read as requiring the jury to answer that issue "no" if a single juror disagreed with the other eleven. Therefore, the trial court was not required to instruct the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court.

**Am Jur 2d, Trial §§ 1109, 1110, 1441 et seq.**

12. **Criminal Law § 680 (NCI4th)— capital sentencing—non-statutory mitigating circumstances—peremptory instruction—pattern instruction inappropriate**

The trial court did not err by refusing to give the peremptory instruction set forth in N.C.P.I.—Crim. 150.11 for nonstatutory mitigating circumstances for which the factual predicate was uncontroverted since this pattern instruction is inappropriate for nonstatutory mitigating circumstances. The instruction given by the trial court complied with the requirement that, in order for a juror to find a nonstatutory mitigating circumstance, the juror must determine not only that the evidence supports the factual basis for the circumstance but also that the circumstance has mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

**13. Criminal Law § 109 (NCI4th)— personality test—defendant's inability to complete—expert's use in formulating opinion—discovery and cross-examination**

Although defendant's expert did not score a personality test administered to defendant or interpret the entire test because defendant wasn't able to perform at a level that was scorable, the State was entitled to pretrial discovery of the test and to cross-examine defendant's expert about the test where the expert considered the answers defendant gave on the test and his inability to complete the test in formulating her opinion on defendant's psychological makeup. N.C.G.S. § 15A-905(b).

**Am Jur 2d, Depositions and Discovery § 466.**

**Right of prosecution to pretrial discovery, inspection, and disclosure. 96 ALR2d 1224.**

**Right of prosecution to discovery of case-related notes, statements, and reports—state cases. 23 ALR4th 799.**

**14. Criminal Law § 1349 (NCI4th)— capital sentencing—statutory mitigating circumstance—request irrelevant**

Whether defendant requested the submission of a statutory mitigating circumstance in a capital sentencing proceeding is of no importance because the trial court must submit the circumstance if it is supported by substantial evidence.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

**15. Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—submission not required**

The trial court did not err by failing to submit the "no significant history of prior criminal activity" mitigating circumstance to the jury in a capital sentencing proceeding where the evidence tended to show that defendant had been convicted in 1981 of three counts of worthless checks and in 1984 of eight counts of felonious larceny and one count of forgery; at the age of four years, defendant and his brother were being hoisted into open windows by their parents to assist in the parents' burglary enterprise; after their parents were sent to prison, defendant and his brother, while living with their grandmother, began to steal to provide for their own subsistence; defendant contended that he abused drugs; and shortly before defendant murdered the victim

in this case, he talked to a coworker about his plan to write worthless checks for gold which he would pawn for cash.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

16. **Criminal Law § 1338 (NCI4th)— capital sentencing—aggravating circumstance—murder to avoid arrest—sufficient evidence**

There was sufficient evidence in a capital sentencing proceeding to support the trial court's submission of the aggravating circumstance that the murder was committed to avoid a lawful arrest where the evidence showed that defendant robbed the victim and killed him to eliminate a witness who defendant felt would testify against him because "he had testified against him and sent him to prison before." Furthermore, the trial court's instruction that the jury should find this circumstance if it found beyond a reasonable doubt that defendant's purpose in killing the victim was "to avoid his arrest and that such arrest was lawful" was of sufficient particularity to enable the jury to understand the law and apply it to the evidence presented and thus did not constitute plain error.

**Am Jur 2d, Criminal Law §§ 598, 599, 628; Trial § 841.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed to avoid arrest or prosecution, to effect escape from custody, to hinder governmental function or enforcement of law, and the like—post-*Gregg* cases. 64 ALR4th 755.**

17. **Criminal Law § 1314 (NCI4th)— capital sentencing— defendant's prison record—exclusion of repetitious testimony**

In a capital sentencing proceeding in which defendant's psychologist testified that defendant's prison record contained only one significant violation involving two homemade knives or "shanks" found in his locker, the trial court did not deny defendant a fair hearing by sustaining the State's objection to a question to the psychologist as to whether it was common for inmates in maximum security to have shanks where the witness had already answered this question by her testimony that defendant's violation was "not uncommon" among inmates in maximum custody facilities.

**Am Jur 2d, §§ 598, 599.**

**18. Criminal Law § 1326 (NCI4th)— capital sentencing—mitigating circumstances—burden of proof—instructions—use of "satisfies"**

The trial court's instruction that jurors could find a mitigating circumstance if the evidence "satisfies any one of you" of its existence did not increase defendant's burden of proof and was not plain error.

**Am Jur 2d, Criminal Law § 628; Trial §§ 1441 et seq.**

**19. Criminal Law § 1323 (NCI4th)— capital sentencing—non-statutory mitigating circumstances—instructions—mitigating value**

The trial court did not err by instructing the jury to find and consider only the nonstatutory mitigating circumstances one or more jurors found to exist and to have mitigating value.

**Am Jur 2d, Criminal Law § 628; Trial §§ 1441 et seq.**

**20. Criminal Law § 1325 (NCI4th)— capital sentencing—instructions—mitigating circumstances found by other jurors**

The trial court did not err by failing to instruct the jury in a capital sentencing proceeding that the entire jury as a whole must consider and weigh any mitigating circumstances found by any juror in reaching its answers to Issue Three and Issue Four.

**Am Jur 2d, Criminal Law § 628; Trial §§ 1441 et seq.**

**21. Criminal Law § 1373 (NCI4th)— first-degree murder—death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where defendant was convicted under theories of premeditation and deliberation and felony murder; the jury found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of an armed robbery and that it was committed for the purpose of avoiding or preventing a lawful arrest; defendant planned and executed the robbery and murder of the seventy-one-year-old victim, who had befriended defendant when defendant worked at the cafeteria

STATE v. McCARVER

[341 N.C. 364 (1995)]

where the crimes occurred; and defendant killed the victim so that the victim could not testify against him.

**Am Jur 2d, Criminal Law § 628.**

Justice FRYE concurring in part and dissenting in part.

Justice WHICHARD joins in this concurring and dissenting opinion.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Freeman, J., at the 8 September 1992 Special Criminal Session of Superior Court, Cabarrus County. Defendant's motion to bypass the Court of Appeals as to his robbery with a dangerous weapon conviction was allowed by the Supreme Court 8 February 1994. Heard in the Supreme Court 12 September 1994.

*Michael F. Easley, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

Defendant was indicted for the 2 January 1987 murder and robbery with a dangerous weapon of Woodrow F. Hartley. He was tried capitally at the 18 April 1988 Criminal Session of Superior Court, Cabarrus County, and was found guilty of both crimes. The jury recommended a sentence of death for the murder, and the trial court sentenced defendant accordingly. The trial court sentenced defendant to forty years in prison for the robbery with a dangerous weapon conviction. On appeal, this Court ordered a new trial on both charges, concluding that prejudicial error occurred when jurors were excused during the capital trial as a result of unrecorded bench conferences between the trial court and jurors in the absence of defendant and his counsel. *State v. McCarver*, 329 N.C. 259, 404 S.E.2d 821 (1991).

Defendant's second trial occurred at the 8 September 1992 Special Criminal Session of Superior Court, Cabarrus County, before a jury selected from a special venire from Rowan County. Defendant was again convicted of murder in the first degree and robbery with a

dangerous weapon. In a capital sentencing proceeding, the jury recommended and the trial court ordered a sentence of death for the murder conviction. The trial court also imposed a sentence of forty years' imprisonment for robbery with a dangerous weapon. Defendant now appeals to this Court.

Evidence presented by the State and defendant at the guilt-innocence and sentencing phases of defendant's trial tended to show the following facts and circumstances: Woodrow F. Hartley was killed on 2 January 1987. An autopsy revealed that Hartley suffered from a bruised neck, a scrape on his chin, a skin tear on his wrist, and three knife wounds to the chest. Dr. Robert L. Thompson, a forensic pathologist, testified that Hartley was alive at the time his neck was injured and that his death was caused by a stab wound which made a one-half inch incision in his aorta. Additionally, Dr. Thompson testified that Hartley had several fractured ribs on his left side which appeared to be caused by something consistent with a person's knees pressed against the ribs.

While working at K & W Cafeteria in Concord, North Carolina, defendant and his brother, Lee McCarver, met and were befriended by Woodrow Hartley. Defendant was sporadically employed at the cafeteria from September 1977 through June 1984. Defendant's usual job was to wash dishes.

On 1 March 1984, defendant was placed on probation for his conviction of eight counts of felonious larceny and one count of forgery. Shortly thereafter, defendant was sent to prison for violating his probation. Defendant believed that Woodrow Hartley, James O'Neal, or defendant's father was responsible for his probation being revoked.

In September 1986, defendant was employed by Shearin Roofing Company in Monroe. While employed with the roofing company, defendant often sought ways to get money. Defendant told co-workers about an old man who worked at K & W Cafeteria who would be an easy target to rob because he always arrived early in the morning to open the cafeteria. Additionally, defendant said the old man had a lot of money on him, especially near payday.

On the evening of 1 January 1987, defendant borrowed a knife from a fellow employee. Early the following morning, defendant and Jimmy Rape drove to Concord in defendant's brown Pontiac. At some time between 4:15 and 4:20 a.m. on Friday, 2 January 1987, defendant

was observed by a police officer traveling toward the Carolina Mall in Concord.

From his past employment, defendant was aware that the victim came to work early in the morning. On 2 January 1987, defendant and Rape entered through the rear entrance of the K & W Cafeteria shortly after Hartley arrived at 5:00 a.m. Defendant walked up to Hartley and talked to him for a few minutes. Rape grabbed Hartley from behind in a headlock and attempted to strangle him. Rape released Hartley, who was then grabbed by defendant in a headlock. When defendant let him go, Hartley fell to the ground. Defendant took a knife from his pants pocket and stuck it into Hartley's chest several times. Hartley died within minutes.

Gene Blovsky, an employee of the cafeteria, observed defendant's automobile parked near the back door of the cafeteria. He saw defendant emerge from behind a wall; defendant was carrying a knife, which he attempted to hide in his right hand. Next, Blovsky saw Hartley lying on the floor in the hallway with a spot of blood on his wrist. Blovsky saw another man near Hartley, realized what had happened, became frightened, and ran out the door. Blovsky then observed defendant and Rape as they left the cafeteria and drove off slowly in defendant's automobile.

Defendant and Rape went to David Shearin's residence at 7:00 a.m. on 2 January 1987 to receive their work assignments. Before going to their assigned job site, defendant and Rape pawned a 1902 silver dollar, which had been taken from the victim, for seven dollars at a Monroe pawn shop. Defendant and Rape were arrested by Monroe police at their assigned job site.

After the arrest, defendant and Rape were transported to the Concord Police Department in separate vehicles. Detective Dennis Andrade read defendant his rights. When asked whether he would answer questions without an attorney, defendant responded that he would and signed a waiver. Detective John Hatley was present with Detective Andrade when defendant gave his statement.

Initially, defendant did not give information pertaining to the murder of Hartley at the K & W Cafeteria. Detective Andrade then informed defendant that the police knew everything and that defendant's brother, Lee, had told the police that he had passed defendant while driving his automobile to the K & W Cafeteria. After speaking with his brother, defendant confessed to murdering Hartley.

Several days after defendant confessed to the crime, defendant's brother, Lee, was interviewed by Detective Andrade. Lee stated that after defendant had killed Hartley, defendant told Lee that he was going to the Kannapolis K & W Cafeteria to kill James O'Neal. Defendant said he felt that O'Neal was responsible for his probation being revoked.

Dr. Faye Sultan, a clinical forensic psychologist, testified as an expert regarding her examination and evaluation of defendant. Dr. Sultan's testimony was that defendant was diagnosed as suffering from borderline intellectual functioning with the intellectual and emotional capability of a ten- or twelve-year-old. Defendant had a history of acute depression throughout his life, leading to a diagnosis of dysthymia. Defendant had a substance and alcohol abuse disorder stemming from his childhood experiences. Additionally, defendant was diagnosed as having a personality disorder that was a direct consequence of sexual abuse as a child and a total lack of nurturing. Dr. Sultan also testified that defendant suffered from a mental and emotional disorder that affected his conduct and impaired his capacity to appreciate the criminality of his conduct and that he had a history of passive orientation and nonviolence. Dr. Sultan felt that defendant functioned well in a structured environment as demonstrated by his record while in custody. Additionally, Dr. Sultan testified that defendant suffered greatly from having been emotionally neglected.

On the murder charge, the jury was instructed that it could find defendant guilty of first-degree murder, guilty of second-degree murder, or not guilty. On the robbery charge, the jury was instructed that it could return a verdict of guilty of robbery with a dangerous weapon or not guilty. The jury returned verdicts of guilty of first-degree murder (under theories of premeditation and deliberation and of felony murder) and guilty of robbery with a dangerous weapon.

In seven assignments of error, defendant contends that errors made by the trial court during the jury selection and guilt determination phases entitle him to a new trial. As to each of these assignments of error, defendant contends that both his federal and state constitutional rights were violated. While defendant couches all of his assignments of error in constitutional terms, many of them involve only a question of whether a particular statute or rule of law was followed by the trial court in its rulings. As to each of these assignments of error, a determination that the particular statutes or rules of law have

not been violated resolves any possible question of a constitutional violation.

**[1]** In defendant's first assignment of error, he contends that the trial court committed reversible error in sustaining objections to his questions of a prospective juror regarding the juror's views about defendant's mental impairments and psychiatric testimony. Defendant argues that his questions were proper under the law and were designed to enable him to select an impartial jury and make intelligent use of his peremptory challenges. Defendant contends that the restrictions on his inquiries violated his federal and state constitutional rights to due process of law and freedom from cruel and unusual punishment. We conclude that the trial court did not unduly restrict defendant's inquiries regarding the juror's views; therefore, defendant's federal and state constitutional rights were not violated.

It is well established that both the State and defendant are entitled to a fair and unbiased jury. "[T]he primary purpose of the *voir dire* of prospective jurors is to select an impartial jury." *State v. Lee*, 292 N.C. 617, 621, 234 S.E.2d 574, 577 (1977).

The focus of defendant's argument is the *voir dire* examination of potential juror Danny Burton by defense counsel. The following colloquy occurred:

MR. GROSSMAN: I'm not sure I understand now. Let me make sure I understand. I believe you said that everybody who commits first degree murder—

JUROR BURTON: Premeditated.

MR. GROSSMAN: . . . premeditated murder should receive the death penalty—

JUROR BURTON: Yes.

MR. GROSSMAN: . . . period.

JUROR BURTON: Period.

MR. GROSSMAN: No matter what they show as the mitigating factors.

JUROR BURTON: Okay, I understand that. No, that shouldn't. I understand what you're saying now.

MR. GROSSMAN: Can you explain why you've sort of changed? Maybe you don't understand. Maybe I don't understand, that's not unusual either.

JUROR BURTON: Well, it's just my opinion that a premeditated murder should be—you know—is a capital crime which should be punishable by death; but there are extreme circumstances, I reckon, or mitigating factors that would say, you know, that it's not justified punishment.

MR. GROSSMAN: Let me ask you this: Would you be able to consider—we asked this question earlier—what type of mitigation would you require in order to consider a life sentence?

MR. KENERLY: Objection.

THE COURT: Sustained.

MR. GROSSMAN: Would you be able to consider psychological testimony about Mr. McCarver himself as mitigating?

MR. KENERLY: Objection.

THE COURT: Sustained.

Using one of his peremptory challenges, defendant excused Burton. At the end of the selection process for the twelve regular jurors and the two alternate jurors, defendant had four peremptory challenges remaining. Thus, defendant cannot show prejudice as it relates to sustaining the objections as to questions asked of juror Burton. *State v. Conner*, 335 N.C. 618, 633, 440 S.E.2d 826, 834 (1994) (no prejudicial error in not allowing defense counsel to question potential juror who was challenged peremptorily where defendant failed to exhaust peremptory challenges); *State v. Avery*, 315 N.C. 1, 21, 337 S.E.2d 786, 797 (1985) (no prejudicial error or abuse of discretion in refusing to allow defense counsel to elicit information from juror where defendant did not exhaust his peremptory challenges).

Defendant further argues that the trial court tended to keep all inquiries about psychological testimony out of the selection process and that the trial court's ruling in regard to juror Burton chilled subsequent inquiry as to potential jurors' attitudes on psychological testimony through the remainder of the selection process. Defendant's assertions are unsupported by the record. The record indicates that defendant was permitted to question at least five other potential jurors about psychological evidence. Four of the five jurors were questioned after defendant used his peremptory challenge to excuse Burton. Thus, we conclude that defendant's inquiry as to jurors' attitudes about psychological testimony was not chilled by the trial court's ruling and that defendant has not shown prejudicial error in

STATE v. McCARVER

[341 N.C. 364 (1995)]

the jury selection process. Defendant was able to select a fair and impartial jury; thus, we reject defendant's first assignment of error.

[2] By his second assignment of error, defendant contends that the trial court committed error by denying his motion to quash the venire after the district court had excused many prospective jurors outside the presence of defendant and his counsel. Specifically, defendant argues that by excusing twenty-three prospective jurors and deferring seven prospective jurors prior to the jury *voir dire*, the district court violated three of defendant's important protections: (1) his unwaivable state constitutional right to be present at each stage of the capital proceeding, (2) his federal constitutional right to due process of law, and (3) a statutory right to a complete recordation of the jury selection proceedings in a capital case. We find no merit in defendant's contentions.

Each of defendant's contentions assumes that the actions of the trial court occurred during a stage of his capital trial. Here, however, the actions complained of occurred prior to the commencement of defendant's capital trial. Thus, the statute and cases cited by defendant do not apply. Defendant did not have a right to be present when the district court judge in Rowan County excused the prospective jurors; therefore, his statutory right and constitutional rights were not violated.

Because of the publicity surrounding this case, the trial court determined that a jury should be selected from Rowan County and that the jury would be transported every day from Rowan to Cabarrus County. Superior Court Judge James C. Davis signed an order directing the selection of a special venire from Rowan County, and the names for the special venire were drawn during the month of August 1992. Defendant and his counsel were not present when the names for the special venire were drawn or when the district court judge in Rowan County excused twenty-three jurors and deferred seven during the screening process, which was completed on 28 August 1992. However, defendant made no requests to attend either of those proceedings.

On 2 September 1992, defendant filed a written motion to quash the venire on the basis that neither defendant nor his counsel had been present when the district court judge excused and deferred persons selected for the venire. Defendant's case was called for trial on 8 September 1992. Before jury *voir dire* for the trial started, defendant's motion was heard; after arguments, it was denied.

A similar situation was before this Court in *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992). In *Cole*, the presiding superior court judge heard excuses from members of a venire who had been summoned to serve for a session of court that started on 17 July 1989. The report of the case does not indicate that defendant made any request to be present during the screening process. The presiding superior court judge questioned individual members of the venire at the bench, off the record and out of the presence of defendant and defendant's counsel. The record indicated that the judge "excused those or deferred those that seemed appropriate." *Id.* at 274, 415 S.E.2d at 716. The remaining members of the venire were administered the oath and dismissed until the next day, 18 July 1989, when the defendant's case was called for trial. We held that it was error to excuse jurors after an unrecorded bench conferences on 19 July 1989 because the defendant's capital trial had commenced and his unwaivable right of presence had attached. However, we rejected the defendant's argument that the trial court committed error by dismissing members of the venire *prior to trial* and out of defendant's presence. We explained our reasoning as follows:

> In this case, it was not error for the court to excuse prospective jurors after the unrecorded bench conferences on 17 July 1989. The defendant's trial had not commenced at that time. The jurors were not excused at a stage of the defendant's trial and the defendant did not have the right to be present at the conferences.

*Id.* at 275, 415 S.E.2d at 717.

Likewise, in this case, defendant's capital trial had not begun at the time the potential jurors were excused or deferred by the district court judge. Since defendant's capital trial had not commenced, defendant's unwaivable right of presence had not attached. *Id.*

Defendant distinguishes *Cole* from this case by arguing that the jury venire in *Cole* was not picked for a specific trial; while, in this case, the venire was picked specifically for defendant's trial. Essentially, defendant argues that the trial actually began when the district court judge heard excuses pursuant to the authority granted under N.C.G.S. § 9-6(b). Defendant does not cite, and we are unable to find, any authority for the proposition that a capital trial begins prior to the calling of the case for trial. Furthermore, the selection process authorized by N.C.G.S. § 9-6(b) is essentially a pretrial screening process which is delegated to the district court, rather than a part of the capital trial. The district court has no authority to con-

STATE v. McCARVER

[341 N.C. 364 (1995)]

duct a capital trial; only the superior court has such authority. We decline to extend the unwaivable right to be present at every stage of a capital trial to pretrial jury selection matters.

[3] In his third assignment of error, defendant contends that the trial court erred in permitting the prosecutor to inform jurors that defendant had been previously tried and that corrective appellate review would be available in this case. Defendant argues that this error tended to diminish the jury's responsibility, thereby denying defendant his federal and state constitutional rights to a fair trial, due process of law, and freedom from cruel and unusual punishment. We conclude that the prosecutor's statements did not tend to diminish the jury's responsibility in this capital case; therefore, defendant's state and federal constitutional rights were not violated.

During the jury selection process, the prosecutor made the following statement:

Two other things that you are going to realize is that there has been a previous trial of this matter; and this is a new trial. The information that will be presented, you'll be hearing for the first time. Can you try this case based upon the evidence that is taken and the law that you receive instruction on and make a decision based on that and not be concerned about any other proceedings that [a]ffected Mr. McCarver? If you have any doubts about your ability to do that, if you'd raise your hand.

Defendant did not object to this statement by the prosecutor. Nevertheless, defendant now contends that this statement tended to diminish the jurors' sense of responsibility for their verdict by suggesting that the verdict might be reviewed. We do not agree.

The prosecutor's comment about a previous trial was made without elaboration as to how the new trial came about and with no comment on the results of the prior trial. Clearly, the jurors' understanding of their responsibilities was not diminished by the prosecutor's statement, and no fundamental right to a fair trial was denied. *See State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994); *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992). This assignment of error is without merit.

[4] In his fourth assignment of error, defendant argues that the trial court erred in rescinding its prior order which required that a special venire be summoned in Mecklenburg County for the purpose of selecting a jury to try defendant's case. Defendant contends that his

state and federal constitutional rights to a fair trial, due process of law, and freedom from cruel and unusual punishment were violated. Additionally, defendant contends that his statutory right to a complete recordation of the proceedings in a capital case was violated. We reject defendant's contentions.

The trial court rescinded its special venire order prior to the commencement of defendant's trial. As stated in response to defendant's second assignment of error, defendant did not have an unwaivable right of presence at the jury selection proceedings which took place prior to his case being called for trial. Additionally, defendant's statutory right to a recordation of the capital trial was not violated by the pretrial order.

The record in this case discloses that the trial court rescinded its order for a special venire from Mecklenburg County because administrative support and physical facilities were not available in Mecklenburg County due to the trial of another capital case. Thus, no abuse of discretion appears. Further, there is no indication that defendant ever requested that pretrial matters be recorded. Accordingly, we reject this assignment of error.

[5] By his fifth assignment of error, defendant argues that the trial court committed reversible error in denying his motion for the disclosure of material evidence in the possession of the prosecutor. Defendant further argues that the trial court committed error in denying his motions for a mistrial or, in the alternative, a new sentencing hearing. Defendant contends a mistrial should have been granted based on the prosecution's use of an undisclosed statement of defendant that substantially prejudiced him by permitting the prosecutor to rely on an improper argument for motive at the guilt determination phase of the trial. Defendant contends that the trial court's error violated his federal and state constitutional rights to a fair trial, due process of law, and freedom from cruel and unusual punishment. We conclude that no error was committed by the trial court; thus, defendant's state and federal constitutional rights were not violated.

Pursuant to N.C.G.S. § 15A-903(a)(2), defendant made a pretrial request for voluntary discovery, seeking in part the disclosure of any statement made by defendant regardless of the person to whom the statement was made. Defendant simultaneously made a motion, pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342 (1976), for the disclosure of exculpatory information, including matters which sug-

gested a lessened culpability of defendant with respect to guilt or punishment. The prosecution responded that all such matters had been disclosed. The trial court denied defendant's motion for the disclosure of exculpatory information; however, the trial court made it clear that if anything became available to the State, the State must immediately notify the defense both by telephone and in writing.

Under N.C.G.S. § 15A-910, when a party fails to comply with a discovery order, the trial court may grant a continuance or a recess, prohibit the violating party from introducing the nondisclosed evidence, or enter any other appropriate order. Because the trial court is not required to impose any sanctions for abuse of discovery orders, what sanctions to impose, if any, are within the trial court's discretion. *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983); *State v. Braxton*, 294 N.C. 446, 242 S.E.2d 769 (1978).

At the capital sentencing proceeding, Lee McCarver testified for defendant. He was cross-examined by the State about a statement he had made five years earlier to police. Lee indicated that he did not recall the statement. Defendant objected and moved to strike the question; the objection was allowed, and the jury was instructed to disregard the question.

Outside the presence of the jury, defendant moved for a mistrial or a new capital sentencing proceeding. In the ensuing discussion between counsel and the trial court, it was determined that the State had in its possession a written statement from Lee McCarver to an officer of the Concord Police Department that had not come to the prosecutor's attention until the preceding day. Lee's statement related to defendant's belief that Hartley was responsible for defendant's parole being revoked. The statement had not been furnished to defendant prior to trial. The trial court denied both the motion for a mistrial and the motion for a new capital sentencing proceeding.

In *State v. Blackstock*, this Court concluded that "[a] mistrial is appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law." *State v. Blackstock*, 314 N.C. 232, 243, 333 S.E.2d 245, 252 (1985). Whether to grant a motion for mistrial is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless it is so clearly erroneous as to amount to a manifest abuse of discretion. *State v. Ward*, 338 N.C. 64, 92-93, 449 S.E.2d 709, 724 (1994), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3833 (1995). In this case, we conclude that the prosecution's conduct did not amount to

such a serious impropriety as to make it impossible for defendant to receive a fair and impartial verdict. For this reason, we conclude that the trial court's denial of defendant's motion for a mistrial did not amount to a manifest abuse of discretion reversible on appeal.

As for the trial court's refusal to grant a new capital sentencing proceeding, we again find no error. Defendant has failed to show any abuse by the State of the discovery order or any abuse of discretion by the trial court. The prosecutor discovered the existence of Lee McCarver's statement only a day before seeking its admission. Even if we were to assume some culpability on the part of the prosecutor for not immediately bringing the statement to the attention of defendant, the trial court sustained defendant's objection and instructed the jury to disregard any reference to the statement. Jurors are presumed to follow a trial court's instructions. *State v. Rouse*, 339 N.C. 59, 92, 451 S.E.2d 543, 561 (1994), *reconsideration denied*, 339 N.C. 619, 453 S.E.2d 188, *petition for cert. filed*, (No. 94-9360, 19 May 1995). Consequently, defendant has failed to show any prejudice from these statements. This assignment of error is without merit.

**[6]** In his sixth assignment of error, defendant contends that the trial court erred in allowing defense counsel to make important tactical decisions about this case without allowing defendant's wishes to control in violation of this Court's opinion in *State v. Ali*, 329 N.C. 394, 407 S.E.2d 183 (1991). We do not believe that *Ali* applies here, and we reject defendant's argument.

During the State's cross-examination of Lee McCarver, defendant asked to speak to the trial court outside the presence of the jury. Before addressing the trial court, defendant spoke privately with defense counsel, who, after the discussion, stated that defendant "will not speak." Defense counsel then said that Lee McCarver's testimony "had a profound effect upon [defendant]." Concerned that his client might walk out of the proceeding and delay its progression, defense counsel stated:

Two or three times this morning [defendant] wanted me to stop the trial and I refused. Frankly, I was on the edge of my seat wondering if [defendant] would simply get up and walk out. I'm not saying he's violent or anything like that, but he's just having a hard time hearing it.

I would like the Court to know that, if I may. I will not let [defendant] run this case. He knows that. He does not control the defense, he can make suggestions. But if his state is so bad, Your Honor, I may stand up at a point and say, "May we have a short recess?"

Defendant also points to the fact that he was not consulted in the peremptory excusal of prospective juror Cindy Grant.

In *Ali*, this Court held that "when counsel and a fully informed criminal defendant client reach an absolute impasse as to . . . tactical decisions, the client's wishes must control." *Ali*, 329 N.C. at 404, 407 S.E.2d at 189. Although defense counsel in the present case may have employed a better choice of words in describing the situation at the time, we find no indication in the record of "an absolute impasse" between the client and the defense team as it concerned trial tactics. At no time did defendant voice any complaints to the trial court as to the tactics of his defense team. Accordingly, we conclude that defense counsel acted properly, and we reject this assignment of error.

[7] In his seventh assignment of error, defendant contends that the trial court committed constitutional error in its jury instructions on the principle of acting in concert. Defendant argues that these instructions allowed the jury to apply the principle of acting in concert to convict defendant of specific-intent crimes if it found that another perpetrator had the requisite *mens rea* to commit them and that the instructions did not require jurors to determine whether defendant ever formed the specific intent required to commit the underlying felony supporting felony murder. We find no error in the trial court's jury instructions.

At the jury instruction conference and before the jury began its deliberation, the trial judge inquired as to whether there were any objections to his giving pattern jury instructions on acting in concert. Defendant did not object to the instructions nor did he request additional instructions or corrections. The trial court gave the pattern jury instructions. Since defendant did not object at trial to these instructions, this issue is before this Court for review only for "plain error." *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983).

In *State v. Abraham*, 338 N.C. 315, 451 S.E.2d 131 (1994), this Court recently addressed the doctrine of acting in concert. This Court stated:

Under the doctrine of acting in concert, where a single crime is involved, one may be found guilty of committing the crime if he is at the scene acting together with another with whom he shares a common plan to commit the crime, although the other person does all the acts necessary to effect commission of the crime. Under this doctrine, where multiple crimes are involved, when two or more persons act together in pursuit of a common plan, all are guilty only of those crimes included within the common plan committed by any one of the perpetrators. As a corollary to this latter principle, one may not be criminally responsible as an accomplice under the theory of acting in concert for a crime which requires a specific intent, unless he, himself, is shown to have the requisite specific intent. . . . In other words, one may not be found guilty of a crime requiring a specific intent under the acting in concert doctrine unless the crime was part of the common purpose or the specific intent on the part of the one sought to be charged is independently proven.

*Id.* at 346, 451 S.E.2d at 147 (citations omitted). We conclude that the instructions in this case were in compliance with the doctrine stated in *Abraham*.

In this case, the trial court gave the following instructions:

*Members of the jury, for a person to be guilty of a crime it is not necessary that he himself do all the acts necessary to constitute the crime. If one or more persons act together with a common purpose to commit a robbery with a dangerous weapon, each of them is held responsible for the acts of the others done in the commission of that crime.*

So members of the jury, I charge that if you find from the evidence, beyond a reasonable doubt, that on or about the date in question the defendant, *acting either by himself or acting together with Jimmy Rape*, had in his possession a dangerous weapon, and took and carried away property from the person or in the presence of a person without his voluntary consent by endangering or threatening his life with the use or threatened use of a dangerous weapon, the defendant knowing that he was not entitled to take the property and intending to deprive that person of its use permanently, it would be your duty to return a verdict of guilty of robbery with a dangerous weapon.

At another point, the trial court gave the following instruction:

So finally I charge that if you find from the evidence and beyond a reasonable doubt that on or about the date in question the defendant, *acting either by himself or acting together with Jimmy Rape*, had in his possession a dangerous weapon, and took and carried away the property from the person or in the presence of a person without his voluntary consent by endangering or threatening their life with the use or threatened use of a dangerous weapon, the defendant knowing that he was not entitled to take the property, and intended to deprive that person of its use permanently; and if you further find, beyond a reasonable doubt, that while committing the crime of robbery with a dangerous weapon, the defendant killed the victim, and that the defendant's act was a proximate cause of the victim's death, it would be your duty to return a verdict of guilty of first degree murder under the felony murder rule.

Specifically, defendant contends that the italicized portions of the above instructions allowed the jury to convict him of crimes regardless of whether defendant himself had the requisite specific intent required to commit the crime. We find no merit in defendant's argument.

A review of the instructions as a whole indicates that the jury was not misled to believe that it could convict defendant based on the intent of his confederate; rather, the instructions made it clear that defendant could have acted either alone or with another to commit the felony. Additionally, the instructions made clear that in order to convict defendant, defendant himself must have had the requisite *mens rea*. We conclude that the instructions in this case were in conformity with the acting in concert doctrine as set forth in *Abraham*; therefore, the trial court did not commit error, much less plain error.

[8] In his final assignment of error relating to the guilt determination phase, defendant argues that the trial court committed error in instructing the jury that premeditation and deliberation could be inferred from a lack of evidence of provocation. According to defendant, this instruction misled the jury, was not supported by the evidence or applicable legal authorities, impermissibly shifted the burden of proof, and constituted an inappropriate expression of judicial opinion on the evidence, thereby denying defendant his federal and state constitutional rights to a fair trial and due process of law. We reject defendant's contention.

The trial court gave the following jury instruction:

STATE v. McCARVER

[341 N.C. 364 (1995)]

[N]either premeditation nor deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as[] lack of provocation by the victim, conduct of the defendant before, during, or after the killing; threats and declarations of the defendant, use of grossly excessive force, infliction of lethal wounds after the victim is felled, brutal or vicious circumstances of the killing, or the manner in which or means by which the killing was done.

Defendant did not object to the instruction. Thus, our review is for plain error only.

We note that defendant concedes that the trial court followed the pattern jury instructions in giving this instruction. Furthermore, the instruction was consistent with previous decisions of this Court which have stated that "[p]remeditation and deliberation may be inferred from 'lack of provocation on the part of the deceased.' " *State v. Weathers*, 339 N.C. 441, 451, 451 S.E.2d 266, 272 (1994) (quoting *State v. Vause*, 328 N.C. 231, 238, 400 S.E.2d 57, 62 (1991)). This Court has also previously stated that the trial court's "mere recital" of circumstances from which premeditation and deliberation may be inferred "cannot be construed as an expression of an opinion that any of them have been proven." *State v. Stevenson*, 327 N.C. 259, 264, 393 S.E.2d 527, 529 (1990) (rejecting defendant's argument that instruction could be understood by the jury as an opinion of the court that the absence of provocation had been proven).

Additionally, from our review of the record, we conclude that the challenged instruction was justified by the evidence in this case. In this case, the evidence shows that there was no provocation by the victim. The evidence was that the victim, Mr. Hartley, was going about his ordinary duties when he was accosted by defendant and his companion, grabbed by the neck, choked, thrown to the floor, and then stabbed. This assignment of error has no merit.

[9] In his first assignment of error concerning his capital sentencing proceeding, defendant contends that the trial court committed reversible error during his capital sentencing proceeding by refusing to instruct the jury that it did *not* need to be unanimous in order to answer "no" to Issue Three on the "Issues and Recommendation as to Punishment" form. He contends that, as a result, the instructions irreparably prejudiced him by reducing the State's burden of proof, improperly coerced a verdict, and deprived him of his federal and state constitutional rights. We disagree.

Issue Three on the written Issues and Recommendation as to Punishment form given the jury in this case reads as follows:

> DO YOU UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND BY ONE OR MORE OF YOU IS, OR ARE, INSUFFICIENT TO OUTWEIGH ·THE AGGRAVATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND UNANIMOUSLY BY YOU IN ISSUE ONE?

After deliberating for several hours, the jury sent a written inquiry to the trial court regarding Issue Three. The note read, "Must there be twelve votes, 'Yes,' or twelve votes, 'No,' to reach a unanimous decision?" After conferring with counsel, the trial court gave the following instruction:

> The answer to that is, Yes, it must be a unanimous twelve person decision as to any answer you reach to that issue, whether it be Yes or whether it be No. It must be a unanimous twelve person decision.

Defendant requested that the trial court amend its instruction in this regard to direct the jury to answer "no"—thus recommending a sentence of life imprisonment—if it could not unanimously agree as to whether the mitigators were insufficient to outweigh the aggravators. The trial court denied this request.

In a capital sentencing proceeding, any jury recommendation requiring a sentence of death or life imprisonment must be unanimous. N.C. Const. art. I, § 24; N.C.G.S. § 15A-2000(b) (Supp. 1994). The policy reasons for the requirement of jury unanimity are clear. First, the jury unanimity requirement "is an accepted, vital mechanism to ensure that *real* and *full* deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community." *McKoy v. North Carolina*, 494 U.S. 433, 452, 108 L. Ed. 2d 369, 387 (1990) (Kennedy, J., concurring) (emphasis added). Second, the jury unanimity requirement prevents the jury from evading its duty to make a sentence recommendation. If jury unanimity is not required, then a jury that was uncomfortable in deciding life and death issues simply could "agree to disagree" and escape its duty to render a decision. This Court has refused to make any ruling which would tend to encourage a jury to avoid its responsibility by any such device. For example, we have expressly stated that a jury instruction that a life sentence would be imposed if a jury could not unanimously agree should never be given because it would be "tantamount to 'an

STATE v. McCARVER

[341 N.C. 364 (1995)]

open invitation for the jury to avoid its responsibility and to disagree.'" *State v. Smith*, 305 N.C. 691, 710, 292 S.E.2d 264, 276 (quoting *Justus v. Commonwealth*, 220 Va. 971, 979, 266 S.E.2d 87, 92 (1980), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983)). The jury may not be allowed to arbitrarily or capriciously take any such step which will require the trial court to *impose or reject* a sentence of death. *State v. Pinch*, 306 N.C. 1, 33, 292 S.E.2d 203, 227, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). Thoughtful and *full* deliberation in an effort to achieve unanimity has only a salutary effect on our judicial system: It tends to prevent arbitrary and capricious sentence recommendations.

Since the sentence recommendation, *if any*, must be unanimous under constitutional and statutory provisions, and particularly in light of the overwhelming policy reasons for a unanimity requirement, we conclude that any issue which is *outcome determinative* as to the sentence a defendant in a capital trial will receive—whether death or life imprisonment—must be answered unanimously by the jury. That is, the jury should answer Issues One, Three, and Four on the standard form used in capital cases either unanimously "yes" or unanimously "no."[1]

In this case, the trial court submitted to the jury a written "Issues and Recommendation as to Punishment" form, which was slightly modified by the trial court from the standard form presented in the North Carolina Pattern Jury Instructions. N.C.P.I.—Crim. 150.10 app. (1993). The form submitted read:

ISSUE ONE

DO YOU UNANIMOUSLY FIND FROM THE EVIDENCE, BEYOND A REASONABLE DOUBT, THE EXISTENCE OF ONE OR MORE OF THE FOLLOWING AGGRAVATING CIRCUMSTANCES?

ANSWER: ―――――――.

. . . .

---

1. Issue Two addresses mitigating circumstances and, whether answered "yes" or "no," is not determinative of the outcome—death or life imprisonment. Under the original capital sentencing scheme of N.C.G.S. § 15A-2000, this Court had required the jury to be unanimous to find any mitigating circumstances. That requirement was found unconstitutional in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), solely as it applied to *mitigating* circumstances.

**STATE v. McCARVER**

[341 N.C. 364 (1995)]

IF YOU WRITE, "YES", IN ONE OR MORE OF THE SPACES AFTER THE FOLLOWING AGGRAVATING CIRCUMSTANCES, WRITE, "YES" IN THE SPACE AFTER ISSUE ONE AS WELL.

IF YOU WRITE "NO" IN ALL THE SPACES AFTER THE FOLLOWING AGGRAVATING CIRCUMSTANCES, WRITE "NO" IN THE SPACE AFTER ISSUE ONE.

. . . .

IF YOU ANSWERED ISSUE ONE "NO", SKIP ISSUES TWO, THREE, AND FOUR, AND *INDICATE LIFE IMPRISONMENT* UNDER "RECOMMENDATION AS TO PUNISHMENT," ON THE LAST PAGE OF THIS FORM.

IF YOU ANSWERED ISSUE ONE "YES", PROCEED TO ISSUE TWO.

ISSUE TWO

DO YOU FIND FROM THE EVIDENCE THE EXISTENCE OF ONE OR MORE OF THE FOLLOWING MITIGATING CIRCUMSTANCES?

ANSWER: —————.

. . . .

IF YOU ANSWERED ISSUE TWO "YES", THEN ANSWER ISSUE THREE.

IF YOU ANSWERED ISSUE TWO "NO", THEN SKIP ISSUE THREE AND ANSWER ISSUE FOUR.

ISSUE THREE

DO YOU UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND BY ONE OR MORE OF YOU IS, OR ARE, INSUFFICIENT TO OUTWEIGH THE AGGRAVATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND UNANIMOUSLY BY YOU IN ISSUE ONE?

ANSWER: —————.

IF YOU ANSWER ISSUE THREE "NO", THEN *INDICATE LIFE IMPRISONMENT* UNDER "RECOMMENDATIONS AS TO PUNISHMENT".

IF YOU ANSWER ISSUE THREE "YES", THEN PROCEED TO ISSUE FOUR.

ISSUE FOUR

DO YOU UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND UNANIMOUSLY BY YOU IN ISSUE ONE IS, OR ARE, SUFFICIENTLY SUBSTANTIAL TO CALL FOR THE IMPOSITION OF THE DEATH PENALTY WHEN CONSIDERED WITH THE

STATE v. McCARVER

[341 N.C. 364 (1995)]

MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES FOUND BY ONE OR MORE OF YOU?

ANSWER: ——————.

IF YOU ANSWER ISSUE FOUR "NO", *INDICATE LIFE IMPRISONMENT* UNDER "RECOMMENDATION AS TO PUNISHMENT" ON THE LAST PAGE OF THIS FORM.

IF YOU ANSWER ISSUE FOUR "YES", INDICATE DEATH UNDER "RECOMMENDATION AS TO PUNISHMENT".

RECOMMENDATION AS TO PUNISHMENT

INDICATE YOUR RECOMMENDATION AS TO PUNISHMENT BY WRITING "LIFE IMPRISONMENT" OR "DEATH" IN THE BLANK IN THE FOLLOWING SENTENCE:

WE, THE JURY, UNANIMOUSLY RECOMMEND THAT THE DEFENDANT, ———————————, BE SENTENCED TO ——————————.

(Emphasis added.)

If unanimity is required *only* when the jury answers "yes" for Issue Three, as defendant suggests, then the jury must be instructed to answer "no"—and *to end the case* by recommending life imprisonment—in two situations: (1) when the jury unanimously agrees to answer "no," and (2) when the jury is not unanimous. Both the form given the jury and the jury instructions direct the jury that if it answers "no" to Issue Three, it must recommend life imprisonment. This instruction, if not coupled with an instruction requiring unanimity, conflicts with the Constitution of North Carolina and with the language of our death penalty statute and will force juries to recommend life imprisonment when they are *not unanimous*. Allowing nonunanimous juries to reach final sentence recommendations of life imprisonment is in direct contradiction to our statutory requirement that "the sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors." N.C.G.S. § 15A-2000(b); *see Green*, 336 N.C. 142, 443 S.E.2d 14.

The requirement of jury unanimity for either "yes" or "no" answers for Issues One, Three, and Four ensures that the jury *properly* fulfills its duty to deliberate *genuinely* for a *reasonable* period of time in its efforts to exercise guided discretion in reaching a unanimous sentencing recommendation, as required by the Constitution of North Carolina and by our death penalty statute itself. The legislature

intended just such a unanimity requirement and intended that should the jury be unable to agree unanimously as to any issue ultimately dispositive of life or death, the jury simply should report that fact to the trial court. It would then be the trial court's duty to impose a sentence of life imprisonment. *See* N.C.G.S. § 15A-2000(b) ("If the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment . . . ."). The statutory scheme established by the legislature has the pronounced advantage of providing that a life sentence shall be entered *by the trial court* if the jury is unable to reach unanimity as to any of the dispositive issues. However, it does so without encouraging any juror to vote for death or life without honestly deliberating with the other jurors, simply because he or she has been informed that he *alone* may *require* that a sentence of life be entered by holding out against the other eleven jurors.

The defendant bases his argument on the language used in the printed "Issues and Recommendation as to Punishment" form drawn from the North Carolina Pattern Instructions and used in this case. N.C.P.I.—Crim. 150.10 app. Defendant argues that language used on the form requires that a negative response to Issue Three must be given when the jury cannot come to a unanimous decision as to the proper sentence. Although Issue Three on the form and the trial court's initial instructions on the issue may be subject to such interpretation, we will not allow such strained syntax and semantics to determine serious issues of law.

As discussed above, Issue Three as well as Issue One and Issue Four are ultimately dispositive of the jury's recommendation as to whether the defendant must live or die. *See McKoy v. North Carolina*, 494 U.S. at 463, 108 L. Ed. 2d at 398 (Scalia, J., dissenting) (Issues Three and Four are "ultimately dispositive"). If a jury answers any of those three issues "no," it *must* recommend a life sentence. If a jury answers all three of those issues "yes," it *must* recommend a sentence of death. *State v. Robbins*, 319 N.C. 465, 515, 356 S.E.2d 279, 308-09, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). The answers to all three of those ultimately dispositive issues leading to any such recommendation must be reached by unanimous decision, whether the jury answers "yes" *or* "no." N.C.G.S. § 15A-2000(b). If we do not require unanimity for a *jury* decision of any issue "ultimately dispositive" as to its recommendation that a defendant live or die, we will violate both our Constitution and our capital punishment statute. Further, we will render capital sentencing proceedings in North

Carolina arbitrary and capricious by allowing the *unguided* discretion of a *single juror* voting "no" to decide the sentence (life imprisonment) the defendant must receive.

If a jury is unable to agree as to Issue One, Issue Two, or Issue Three after a reasonable time, the *trial court* will of course be required to acknowledge that fact and itself enter a judgment of imprisonment for life. N.C.G.S. § 15A-2000(b). The *jury* should not be made aware of this state of the law, however, as to inform the jury that its failure to agree on determinative issues will result in a sentence of life imprisonment would be an open invitation to the jury— or a single juror—to avoid its responsibility to *fully* deliberate and to force a recommendation of life by the simple expedient of disagreeing. *State v. Smith*, 305 N.C. at 710, 292 S.E.2d at 276. Thus, it has been our law that even when the jury specifically asks what the ultimate result will be if it fails to reach unanimity, the trial court may only inform the jurors that their inability to reach unanimity "should not be their concern but should simply be reported to the court." *State v. Smith*, 320 N.C. 404, 422, 358 S.E.2d 329, 339 (1987). Here, however, the jury made no such express or specific inquiry, and no such additional instruction was required. *Id.*

[10] For the foregoing reasons, we conclude that the trial court did not err in its oral answer to the jury's questions when it stated that the jury must be unanimous before answering either "yes" or "no" to Issue Three—a dispositive issue with regard to the decision of whether the defendant must live or die. Further, the fact that Issue Three on the form used in this case, and the trial court's initial instructions on that issue, could be read as improperly directing that the jury answer "no" if unable to reach unanimity did not amount to prejudicial error. Assuming that the jury understood Issue Three on the written form to require it to answer "no" if it could not reach unanimity, such an erroneous instruction was favorable to the defendant; the jury would have thought that only one juror need have voted "no" to require that the jury answer the issue "no" and a sentence of life be entered. Such an error favorable to a defendant is clearly harmless beyond a reasonable doubt. *See State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982) (improper instruction on self-defense which was advantageous to defendant held harmless beyond reasonable doubt). For the foregoing reasons, this assignment of error is without merit.

[11] In a related assignment of error, defendant contends that the trial court committed reversible error by instructing the jury to

resume deliberations in an effort to render a unanimous decision without offering the jury any specific way to report an inability to achieve unanimity.

After the jury asked in a written question, "Must there be twelve votes, 'Yes,' or twelve votes, 'No,' to reach a unanimous decision?" the following colloquy occurred:

THE COURT: The answer to that is, Yes, it must be a unanimous twelve person decision as to any answer you reach to that issue, whether it be Yes or whether it be No. It must be a unanimous twelve person decision.

Does that answer your question?

JUROR BASINGER: Yes, sir.

One more question, if I may ask. If there is not a unanimous decision, what steps are taken then as to the paper? Unless I'm reading it wrong—the reason that I'm asking because the way that the question is stated I might look at it totally different than juror number one would look at it and that's the reason we came out to ask because we want to be sure of what we were reading.

THE COURT: Well, the answer is that it must be unanimous twelve person decision. If what you're saying is—you understand that it can't be a majority vote, it must be a unanimous twelve person decision. So I'm going to ask you to continue deliberations with that instruction in mind. Does that answer your question?

JUROR BASINGER: Yes, sir.

Defendant contends the jury's question was an inquiry as to what the result would be if the jury failed to reach a unanimous decision. *See Smith*, 320 N.C. 404, 358 S.E.2d 329. We have held "that *upon inquiry by the jury* the trial court must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." *Id.* at 422, 358 S.E.2d at 339. This is not such a case.

We must examine the question posed by the jury in the context of the trial court's instructions to determine if it truly is an "inquir[y] into the result of its failure to reach a unanimous verdict." *Smith*, 320 N.C. at 422, 358 S.E.2d at 339 (emphasis omitted). The jury's confusion in this case, as discussed above, concerned the phraseology used on the printed Issues and Recommendation as to Punishment form.

After being instructed that it must be unanimous for either "yes" or "no," the jury, through its foreman, asked *how* to answer the confusing Issues and Recommendation form: "[W]hat steps are taken then as to the paper?" A moment later, the jury, through its foreman, reiterated its initial confusion caused by the form: "[B]ecause the way that the question is stated I might look at it totally different than juror number one would look at it . . . ." The questions by the jury did not constitute an inquiry into the results should it fail to reach unanimity. Instead, it appears that during their course of deliberations, the jurors noticed the inconsistency in the trial court's proper instructions and the printed Issues and Recommendation as to Punishment form; the form can be read as requiring that if a *single juror* disagrees with the other eleven, Issue Three must be answered "no." The jury merely sought guidance as to the procedure for giving an answer to Issue Three. The jury did not ask what would happen if it could not come to a unanimous decision.

Because the jury did not inquire into the result should it not be able to come to a unanimous decision, the *Smith* instruction was not warranted. Therefore, defendant's assignment of error is without merit.

[12] In his next assignment of error, defendant contends that the trial court committed reversible error by refusing to give peremptory instructions on those mitigating circumstances for which the factual predicate was uncontroverted.

The trial court instructed the jury on each nonstatutory mitigating circumstance as follows:

> If any one or more of you find by a preponderance of the evidence that this circumstance exists, and also is deemed mitigating, you would so indicate by having your foreman write, "Yes," in the space provided after this mitigating circumstance on the form. If none of you find the circumstance to exist, or if none of you deem it to have mitigating value, you would so indicate by having your foreman write, "No," in that space.

During the charge conference, defendant specifically requested that North Carolina Pattern Instruction 150.11 be read to the jury. In part, it reads:

> [A]s to this mitigating circumstance, I charge you that if one or more of you finds the facts to be as all the evidence tends to show, you will answer "Yes" as to Mitigating Circumstance

Number (read number) on the "Issues and Recommendation" form.

N.C.P.I.—Crim. 150.11 (1991).

Defendant's proposed instruction would not have been a proper peremptory instruction in the context of this case. In *Green*, 336 N.C. 142, 443 S.E.2d 14, this Court held that N.C.P.I.—Crim. 150.11 is not a proper peremptory instruction to be used with regard to a nonstatutory mitigating circumstance. We said that

> before a juror "finds" a *nonstatutory* mitigating circumstance, he or she must make two preliminary determinations: (1) that the evidence supports the factual existence of the circumstance, *and* (2) that the juror deems the particular circumstance to have mitigating value in the case in question.

*Id.* at 174, 443 S.E.2d at 33. The instructions actually given in the present case conform to the requirements of *Green*. Therefore, we find that defendant's assignment of error is without merit.

[13] In his next assignment of error, defendant contends that the trial court committed reversible error in permitting the prosecutor to cross-examine defendant's expert about the results of a personality test upon which she did not rely and in requiring defendant to disclose the results of the test. Pursuant to the State's request for discovery, the court ordered defendant to produce any and all results of physical and mental examinations in defendant's possession. Defendant specifically objected to the production of individual answers to one test in particular, the Minnesota Multiphasic Inventory Test (MMPI), because defendant did not complete the test and did not intend to introduce its results. Moreover, defendant contends that his expert did not rely on the test in forming her expert opinion on defendant's psychological makeup. Defendant's expert, Dr. Sultan, testified that defendant "wasn't able to perform at a level that was scorable, and so no interpretation of that test is possible . . . ." Dr. Sultan went on to say that "[n]o interpretation beyond the fact that it is not scorable is appropriate. And that is the interpretation of every psychologist who has administered it to him."

N.C.G.S. § 15A-905, which governs the State's right to pretrial discovery in criminal cases, provides that in certain situations the State must be permitted to inspect and copy

> results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case . . . which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1988). The issue in the present case is not whether this particular test was scorable, but whether the expert gleaned any information from the test, its answers, or even defendant's inability to complete a scorable test which related to the expert's testimony. If so, the test is both discoverable and a proper subject for cross-examination.

Although defendant's expert did not score or interpret the entire test, her testimony reveals that she considered the answers he gave and his inability to complete the test in formulating her final opinion of defendant. During direct examination, Dr. Sultan testified that defendant could not complete the test because it was "beyond his intellectual capacity." However, she then stated she was able to derive "some primitive kinds of information" about some "fundamental" information concerning defendant's personality. At this point in her testimony, she was referring to the MMPI and defendant's inability to comprehend the test. Yet, even though the test itself could not be scored, she did derive some "primitive" and "fundamental" information from it which went into the formation of her opinions. Consequently, the State was entitled to inspect and copy the test, which provided her with some "raw data," and to cross-examine her on that subject. This assignment of error is without merit.

[14] In another assignment of error, defendant argues that the trial court erred in allowing defense counsel to withdraw a request to submit the statutory mitigating circumstance that defendant had no significant history of prior criminal activity, a circumstance defendant contends was supported by the evidence. Defendant initially requested the submission of this statutory mitigating circumstance; however, after the trial court questioned the wisdom of defendant's request, defendant withdrew it. Defendant now asserts that the trial court should have submitted the circumstance because the evidence would support a rational jury's finding that defendant did not have a significant history of prior criminal acts.

Whether defendant requested submission of the statutory mitigating circumstance does not concern us here. A "trial court has no

discretion as to whether to submit statutory mitigating circumstances when evidence is presented in a capital case which may support a statutory circumstance." *State v. Skipper*, 337 N.C. 1, 44, 446 S.E.2d 252, 276 (1994), *cert. denied*, —— U.S. ——, 103 L. Ed. 2d 895 (1995). The trial court must submit the circumstance if it is supported by substantial evidence. The trial court is required "to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988) (emphasis added).

[15] In the present case, evidence tended to show that defendant had been convicted on 1 May 1981 of three counts of worthless checks. He had also been convicted on 1 March 1984 of eight counts of felonious larceny and one count of forgery. Further, at the age of four years, he and his brother were being hoisted into open windows by their parents to assist in the parents' burglary enterprise. After their parents were sent to prison, defendant and his brother, while living with their grandmother, began to steal to provide for their own subsistence. Defendant also contended that he abused drugs. Shortly before defendant murdered the victim in this case, he talked to a coworker about his plan to write worthless checks for gold, which, in turn, he would pawn for cash.

We have previously held that similar histories barred the submission of "no significant history of prior criminal activity" as a mitigating circumstance. *See State v. Jones*, 336 N.C. 229, 247, 443 S.E.2d 48, 56-57 (1994) (defendant used illegal drugs, broke into a convenience store six or seven times, and broke into a pawn shop and stole guns), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 423 (1994), *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 676 (1995); *State v. Robinson*, 336 N.C. 78, 119, 443 S.E.2d 306, 326 (1994) (defendant used and dealt drugs, had pled guilty to a robbery, carried a pistol, and used another man's driver's license as identification), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995); *State v. Stokes*, 308 N.C. 634, 653-54, 304 S.E.2d 184, 196 (1983) (defendant engaged in five incidents of theft and possessed, used, and sold marijuana). Therefore, we conclude that the statutory mitigating circumstance of "no significant history of prior criminal activity" should not have been submitted in this case. Defendant's assignment of error is overruled.

[16] By another assignment of error, defendant contends that the trial court erred in overruling his objection to the submission of the aggravating circumstance that the murder was committed to avoid a

lawful arrest. Defendant argues that there was insufficient evidence to support the submission of this aggravating circumstance to the jury. We disagree.

The jury in a capital sentencing hearing is allowed to consider as an aggravating circumstance that "[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest." N.C.G.S. § 15A-2000(e)(4). Submission of the aggravating circumstance that the capital felony was committed to avoid or prevent a lawful arrest has been upheld in circumstances where a murder was committed to prevent the victim from capturing defendant and where a purpose of the killing was to eliminate a witness. *State v. Green*, 321 N.C. 594, 365 S.E.2d 587, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988).

In this case, the evidence tends to show that defendant robbed Mr. Hartley and killed him because defendant believed the victim would testify against him. Prior to the murder, defendant told Tony Jackson and David Shearin that he planned to rob an old man in a cafeteria in Concord's Carolina Mall who had testified against him on a prior occasion. Jackson testified that defendant said if Mr. Hartley saw him, defendant would have to kill Mr. Hartley because he had testified against defendant before and was certain to do so again. After the murder, defendant told Jackson that he stabbed Hartley because "he had testified against him and sent him to prison before."

The evidence was sufficient to support a rational jury's finding that one of defendant's purposes for the murder was the desire to eliminate a witness who defendant felt would testify against him. Therefore, the trial court properly submitted this aggravating circumstance in the defendant's capital sentencing proceeding.

Defendant also argues that the trial court erred in its instructions to the jury regarding this aggravating circumstance. The trial court instructed the jury with respect to this circumstance as follows:

Now, a murder is committed for such purpose if the defendant's purpose at the time he kills is, by that killing, to avoid the arrest of himself or some other person and that arrest would have been lawful.

If you find from the evidence and beyond a reasonable doubt that when the defendant killed the victim, it was in fact his purpose to avoid his arrest and that such arrest would have been lawful, you would find this aggravating circumstance . . . .

Defendant contends this instruction did not adequately define the circumstance or guide the jury in its evaluation of the evidence.

The record shows that defendant did not object to the instructions or request more specific instructions. This assignment of error is therefore barred by Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure, and defendant is not entitled to relief unless any error constituted plain error. *See State v. Odom*, 307 N.C. 655, 659-60, 300 S.E.2d 375, 378. To rise to a level of plain error, the error in the instructions must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). In other words, the error must be one "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

Having reviewed the trial court's instructions on the aggravating circumstance at issue, we find no plain error. The instructions given were of sufficient particularity to enable the jury to understand the law and apply it to the evidence presented. No more was required of the trial court. We therefore cannot say that the trial court committed plain error. This assignment of error is without merit.

Defendant next contends that the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(4) is overly broad and, therefore, unconstitutional. Defendant did not raise this issue in the trial court and therefore failed to preserve the question for appellate review. *State v. Brown*, 320 N.C. 179, 211, 358 S.E.2d 1, 23 (1987), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). This assignment of error is overruled.

[17] By another assignment of error, defendant contends that the trial court erred by excluding testimony that maximum security inmates commonly had homemade knives or "shanks" in their cells and that this exclusion denied defendant a fair sentencing hearing. Dr. Sultan testified that defendant's prison record contained only one significant violation, which involved two such knives found in his locker by prison officials. Comparing defendant's record to that of other inmates, Dr. Sultan testified that defendant's infraction was "very unremarkable." Dr. Sultan also testified that defendant's violation was "not uncommon" among inmates in maximum custody facilities. Later, defense counsel asked: "Is it common for inmates in

maximum security to have shanks?" The State objected, and the trial court sustained the objection.

Defendant argues the exclusion prevented the presentation of relevant mitigating evidence to the jury. We disagree. Assuming *arguendo* that Dr. Sultan's answer would have been relevant, she had already given testimony which answered that question. The trial court did not abuse its discretion by preventing defendant's question which called for repetitious testimony.

**[18]** In his next assignment of error, defendant contends that the trial court committed reversible error by refusing to instruct the jurors that "preponderance of the evidence," the burden of proof applicable to mitigating circumstances, means proof showing that it is more likely than not that a mitigating circumstance exists. The trial court instructed the jurors that they could find a mitigating circumstance if the evidence "satisfies any one of you" of its existence. Defendant contends that because the jury might have understood the term "satisfies" to mean a greater degree of proof than "more likely than not," the instruction was erroneous.

Defendant did not object to the instruction at trial, so our review is limited to one for plain error. We have previously addressed this same issue in *State v. Payne*, 337 N.C. 505, 448 S.E.2d 93 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). There we held that the trial court's use of "satisfy" did not increase defendant's burden of proof. *Id.* Accordingly, we conclude there was no plain error and reject defendant's assignment of error.

**[19]** In his next assignment of error, defendant argues that the trial court committed reversible error by instructing the jury that it could refuse to consider mitigating evidence. In this case, the trial court told the jury to find and consider only the nonstatutory mitigating circumstances one or more jurors found to exist and to have mitigating value. A similar instruction was approved in *Green*, 336 N.C. 142, 443 S.E.2d 14, and we see no reason to overturn that decision now. Accordingly, we find no merit in defendant's assignment of error.

**[20]** In another assignment of error, defendant asserts that the trial court committed reversible error in the capital sentencing proceeding by failing to instruct that the entire jury as a whole must consider and weigh any mitigating circumstance found by any juror in reaching its answers as to Issue Three and Issue Four. We have rejected this very argument in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*,

—— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied,* —— U.S. ——, 130 L. Ed. 2d 532 (1994). This assignment of error is without merit.

Defendant has also brought forward numerous other assignments of error presenting "preservation issues." As to each of these issues, defendant acknowledges with commendable candor that prior decisions of this Court require a ruling contrary to his contentions. He raises them for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving these issues for any necessary federal habeas corpus review. Having carefully examined each of those assignments of error, we conclude that they are without merit.

### Proportionality Review

Having concluded that defendant's capital sentencing proceeding was free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. *See State v. Williams,* 308 N.C. 47, 79, 301 S.E.2d 335, 354-55, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.*

We have thoroughly examined the record, transcripts, and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

[21] We turn now to our final statutory duty of proportionality review. In conducting proportionality review, "we determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *Id.*

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar

with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

In the present case, defendant was convicted of first-degree murder (under theories of premeditation and deliberation and of felony murder) and of robbery with a dangerous weapon. The jury found the aggravating circumstances that the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4), and that the murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5).

The jury found as mitigating circumstances that (1) the offense was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the offense, N.C.G.S. § 15A-2000(f)(6); (3) defendant has a history of passive orientation and nonviolence; (4) defendant's intelligence quotient is in the lower range of borderline intellectual functioning, similar to that of a ten- to twelve-year-old; (5) defendant has been a good, dependable, hardworking employee; (6) defendant cooperated with law enforcement officers during his arrest and voluntarily gave a statement admitting his involvement and activity at an early stage of the criminal proceeding; (7) defendant does well in a structured setting and has done well in a structured setting; (8) defendant was and is emotionally neglected and has chronic feelings of deprivation, inadequacy, and anger and is uncomfortable and frightened by these feelings; (9) defendant suffers and has suffered from clinical depression throughout his life; (10) defendant was the victim of severe economic deprivation; (11) defendant was taught criminal behavior at a very early age by his parents and was forced by his parents to participate in criminal activity; (12) defendant was the victim of sexual abuse at a young age by an older male, which affected his feelings about men permanently; (13) defendant has been diagnosed as suffering from psychotic behavior; and (14) defendant has the capacity to love and loves his girlfriend, daughter, and brother.

In our proportionality review, we compare the present case with other cases in which this Court has ruled upon the proportionality

issue. This case is not particularly similar to any case in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. Each of those cases is distinguishable from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the evidence tended to show that the defendant hid in the bushes at a bank for about two hours waiting for the victim to make his nightly deposit. When the victim arrived at the bank, the defendant demanded the money bag. The victim hesitated, so the defendant fired a shotgun, striking him in the upper portion of both legs. The victim later died of cardiac arrest caused by the loss of blood from the shotgun wounds. The jury found only one aggravating circumstance—that the murder was committed for pecuniary gain. The defendant also pled guilty during the trial and acknowledged his wrongdoing before the jury.

*Benson* is easily distinguishable from the present case. In *Benson*, unlike the present case, some evidence tended to show that the defendant did not intend to kill the victim because he shot the victim in the legs rather than a more vital part of his body. In the present case, defendant purposefully stabbed the victim in the chest and killed him. He had previously stated that if the victim saw him, he would have to kill the victim so that he would not testify against defendant again. Also, unlike the situation in *Benson*, the jury here found two aggravating circumstances.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and several others planned to rob the victim's place of business. During the robbery, one of the assailants severely beat the victim, killing him. *Stokes* is also easily distinguishable from the present case because Stokes' codefendant, whom the majority of this Court seemed to believe equally culpable with Stokes, was sentenced to life imprisonment. In addition, the jury in *Stokes* found only one aggravating circumstance—that the murder was especially heinous, atrocious, or cruel—while the jury here found two aggravating circumstances.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the only aggravating circumstance found by the jury was that the murder for which Rogers was convicted was part of a course of conduct which included the commission of violence against another person or persons. In the present case, the jury found two aggravating circumstances—that the murder was committed for the purpose

of avoiding lawful arrest and that the murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home intending to rob and murder him. After gaining entry into the victim's home, the men killed the victim and stole his money. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary and that it was committed for pecuniary gain. In *Young*, the jury did not find the aggravating circumstance of witness elimination, a circumstance found in the case *sub judice*. The finding of this circumstance distinguishes the two cases because witness elimination is an attack upon the judicial system itself.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the single aggravating circumstance found by the jury was that the murder was committed against a law enforcement officer engaged in the performance of his official duties. *Hill* is easily distinguishable from this case in which defendant robbed and killed an elderly cafeteria worker with the additional aggravating circumstance of witness eradication.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant was on foot and waved down the victim as the victim passed in his truck. Shortly thereafter, the victim's body was discovered in his truck. He had been shot twice in the head, and his wallet was gone. The single aggravating circumstance found was that the murder was committed for pecuniary gain. In contrast, the jury here found that the murder was committed for the purpose of avoiding lawful arrest and that the murder was committed during the commission of a robbery with a dangerous weapon.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), the evidence tended to show that the defendant and a group of friends were riding in a car when the defendant taunted the victim by telling him that he would shoot him and questioning whether the victim believed he would shoot him. The defendant shot the victim but then immediately directed the driver to proceed to the emergency room of the local hospital. In concluding that the death penalty was disproportionate there, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast, the jury in the present case found that defendant killed the victim to prevent him from testifying against him.

STATE v. McCARVER

[341 N.C. 364 (1995)]

It bears noting that we have never found a death sentence to be disproportionate in witness-elimination cases. The reason is clear: "Murder can be motivated by emotions such as greed, jealousy, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion." *State v. Oliver*, 309 N.C. 326, 375, 307 S.E.2d 304, 335 (1983). The murder in the present case was nothing but cold and calculated. The only reason the victim was killed was to prevent him from testifying against defendant. The purposeful and deliberate killing of witnesses or possible witnesses strikes a blow at the entire public—the body politic—and directly attacks our ability to apply the rule of law and to bear witness against the transgressors of law in our society. *See Hill*, 311 N.C. 465, 319 S.E.2d 163 (Mitchell, J., dissenting) (murder of law enforcement officer is attack on entire public).

For the foregoing reasons, we conclude that each of the cases in which we have found the death penalty to be disproportionate is distinguishable from the present case. The present case bears little similarity to any of those cases.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994). Although we review all of the cases in the pool when engaging in our statutorily mandated duty of proportionality review, we reemphasize here "that we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* "The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977." *Williams*, 308 N.C. at 81-82, 301 S.E.2d at 356. Here, it suffices to say that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to all other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. However, the factors to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. "Therefore, the

fact that in one or more cases factually similar to this case, a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review." *Green,* 336 N.C. at 198, 443 S.E.2d at 47.

Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." *Williams,* 308 N.C. at 80-81, 301 S.E.2d at 356. Instead, we have held "that the constitutional requirement of 'individualized consideration' as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the 'experienced judgments' of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators, and other circumstances." *State v. Keel,* 337 N.C. 469, 502, 447 S.E.2d 748, 767 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 147 (1995). Also, "the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green,* 336 N.C. at 198, 443 S.E.2d at 47.

Defendant here has cited a number of cases involving murders committed in the course of robberies. It suffices to say that we have examined all of the numerous cases cited by defendant. Where defendants have killed their victims as part of a planned witness elimination, some defendants have received life imprisonment and others have been sentenced to death. This murder was committed in the course of a robbery; equally important, it was a murder to eliminate a possible witness. In *State v. Robinson,* 339 N.C. 263, 451 S.E.2d 196 (1994), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3873 (1995); *State v. Sexton,* 336 N.C. 321, 444 S.E.2d 879, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 429 (1994); *McCollum,* 334 N.C. 208, 433 S.E.2d 144; *State v. Hunt,* 323 N.C. 407, 373 S.E.2d 400 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand,* 330 N.C. 501, 411 S.E.2d 806, *cert. denied,* —— U.S. ——, 120 L. Ed. 2d 913 (1992); *State v. Maynard,* 311 N.C. 1, 316 S.E.2d 197, *cert. denied,* 469 U.S. 963, 83 L. Ed. 2d 299 (1984); *Lawson,* 310 N.C. 632, 314 S.E.2d 493; and *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980), juries imposed death penalties in

cases involving witness elimination. We cannot say that juries have consistently recommended life sentences in cases similar to the present case.

All of the evidence presented in the present case was to the effect that defendant planned and executed the robbery and murder of the seventy-one-year-old victim, Mr. Hartley, who had befriended defendant when defendant worked at the K&W Cafeteria. Defendant killed the victim so that the victim could not testify against him. All things considered, we do not find that this case presents any serious proportionality question. After comparing this case carefully with all others in the pool of "similar cases" used for proportionality review, we conclude that it falls within the class of first-degree murders for which we have previously upheld the death penalty. For the foregoing reasons, we conclude that the sentence of death entered in the present case is not disproportionate.

Having considered and rejected all of defendant's assigned errors, we hold that defendant's trial and capital sentencing proceeding were free of prejudicial error. Therefore, the sentence of death entered against defendant must be and is left undisturbed.

NO ERROR.

Justice FRYE concurring in part and dissenting in part.

I concur in the Court's decision finding no prejudicial error in defendant's trial and conviction of first-degree murder and robbery with a dangerous weapon. I dissent only as to the capital sentencing proceeding.

I find nothing in the North Carolina Constitution or in our death penalty statute requiring a jury in a capital sentencing proceeding to be unanimous in order to give a negative answer to an issue requiring a positive finding as a prerequisite to a recommendation that a person be sentenced to death. This is the effect of the majority's holding as to the first issue in the capital sentencing proceeding. I therefore dissent as to this issue.

The majority first relies upon Article I, Section 24 of the North Carolina Constitution for the proposition that any jury recommendation requiring a sentence of death or life imprisonment must be unanimous. This section simply says that:

> No person shall be convicted of any crime but by a unanimous verdict of a jury in open court. The General Assembly may, however, provide for other means of trial for misdemeanors, with the right of appeal for trial de novo.

N.C. Const. art. I, § 24. This section requires a unanimous verdict of a jury in open court in order to convict a person of a crime. In this case, as in all capital cases in North Carolina, we do not get to a capital sentencing proceeding until after a jury has convicted the defendant of the capital crime by a unanimous verdict in open court. The majority's proposition relates to any sentencing recommendation, not a conviction. Thus, I do not find the majority's conclusion to be supported by Article I, Section 24 of the North Carolina Constitution.

The majority cites N.C.G.S. § 15A-2000(b) in support of the same proposition. Note, however, that the proposition is stated in terms of any jury recommendation. The recommendation can be one of only two sentences: life imprisonment or death. Under N.C.G.S. § 15A-2000(b), the jury must hear the evidence, arguments of counsel, and instructions of the court before deliberating and delivering a sentence recommendation to the court. This sentence *recommendation* (life imprisonment or death) must be based upon the jury's *consideration* of:

> (1) Whether any sufficient aggravating circumstance or circumstances as enumerated in subsection (e) exists; [and]

> (2) Whether any sufficient mitigating circumstance or circumstances as enumerated in subsection (f), which outweigh the aggravating circumstance or circumstances found, exists[.]

N.C.G.S. § 15A-2000(b) (Supp. 1994). Thus, under N.C.G.S. § 15A-2000(b), before the jury may *recommend*, it must first *consider* whether any enumerated sufficient aggravating circumstances exist, whether any enumerated sufficient mitigating circumstances exist, and whether those mitigating circumstances outweigh the aggravating circumstances.

In order to facilitate the jury's *consideration* of the matters mandated by the statute, the court gives the jury four issues to answer. In order to facilitate the jury's *recommendation*, the court gives the jury one question to answer. For convenience, and to assist the jury in understanding and following the court's instructions, the court gives the jury a form to take into the jury room. It is labeled: Issues and Recommendation as to Punishment.

STATE v. McCARVER

[341 N.C. 364 (1995)]

N.C.G.S. § 15A-2000(b) says that "[t]he sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors. Upon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror concurs and agrees to the sentence recommendation returned." Note again that the language of the statute is that the "sentence recommendation" must be unanimous. There is no express provision in N.C.G.S. § 15A-2000(b) requiring unanimity as to the jury's consideration of matters leading to its recommendation.

The majority next relies on a quote from Justice Kennedy's concurring opinion in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). In *McKoy*, the United States Supreme Court held that North Carolina's capital sentencing scheme's unanimity requirement as to mitigating circumstances "violates the Constitution by preventing the sentencer from considering all mitigating evidence." *Id.* at 435, 108 L. Ed. 2d at 376. Concurring in the judgment, Justice Kennedy said:

> Jury unanimity, it is true, is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community. Yet the unique interaction of the elements of the sentencing statute in issue here can allow the same requirement of unanimity to produce a capital sentence that lacks unanimous support of the jurors, and, more than this, is thought to be inappropriate by 11 of the 12.

*Id.* at 452, 108 L. Ed. 2d at 387. The second sentence of Justice Kennedy's concurring opinion makes it clear that, at least in some circumstances, requiring unanimity as to one of the issues the jury must consider in making a sentencing recommendation may result in a capital sentence thought to be inappropriate by some, if not most, of the jurors. Thus, I do not believe that, even if Justice Kennedy had spoken for a majority of the Supreme Court, his views would support the majority's rule set forth in this case that the jury must be unanimous to answer "no" to Issue Three.

The majority's ultimate rationale for requiring the jury to be unanimous to give a negative answer to Issue Three is that this requirement prevents the jury from evading its duty to make a sentence recommendation. I do not accept this rationale, and I find nothing in our Constitution, our capital sentencing statute, or our cases to support it. The cases cited by the majority require unanimity in the jury's rec-

ommendation as to sentence, and I agree with the rationale of those cases. However, they are not controlling on the question here which relates to an issue the jury must answer before making a recommendation as to sentence. I now consider defendant's argument.

For his first assignment of error in the sentencing phase of his trial, defendant contends that the trial court committed reversible error in giving an erroneous answer to a question by the jury and then refusing to instruct the jury that it did not need to be unanimous in order to give a negative answer to Issue Three on the written Issues and Recommendation as to Punishment form. I agree.

Under subsection (c) of N.C.G.S. § 15A-2000, if the jury recommends a sentence of death, the jury foreman is required to sign a writing on behalf of the jury setting out specific findings in support of the jury's recommendation. Subsection (c) provides:

> (c) Findings in Support of Sentence of Death.—When the jury recommends a sentence of death, the foreman of the jury shall sign a writing on behalf of the jury which writing shall show:
>
> > (1) The statutory aggravating circumstance or circumstances which the jury finds beyond a reasonable doubt; and
> >
> > (2) That the statutory aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and,
> >
> > (3) That the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found.

N.C.G.S. § 15A-2000(c) (Supp. 1994).

The language of this subsection is mandatory: "the foreman . . . *shall* sign a writing on behalf of the jury which writing *shall* show" the three requirements set out in this subsection. *Id.* (emphasis added). If the writing does not show that these requirements have been met, the jury may not recommend, and the judge may not impose, a sentence of death. Thus, unanimity is required in order for the jury to find the statutory requisites to the recommendation of a sentence of death, and unanimity is required for the recommendation itself. In short, while N.C.G.S. § 15A-2000(b) requires the jury recommendation to be unanimous, N.C.G.S. § 15A-2000(c) requires that both the jury's

recommendation of death and the findings in support thereof be unanimous.

In compliance with subsection (c) of N.C.G.S. § 15A-2000, Issue Three on the written Issues and Recommendation as to Punishment form submitted to the jury in this case was as follows:

> Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found by one or more of you is, or are, insufficient to outweigh the aggravating circumstance or circumstances found unanimously by you in Issue One?

The trial court correctly instructed the jury:

> If you unanimously find beyond a reasonable doubt—you'll notice, unanimously, twelve person decision—If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer Issue Number Three, "Yes." *If you do not so find, or have a reasonable doubt as to whether they do, you would answer Issue Number Three, "No."*

(Emphasis added.)

After several hours of deliberation, the jury sent a question to the judge regarding Issue Number Three. The question read: "Must there be twelve votes, 'Yes,' or twelve votes, 'No,' to reach a unanimous decision?" After conferring with the parties, the judge had the jury return to the courtroom, and the following colloquy occurred between the judge and the foreman of the jury:

> THE COURT: The answer to that is, Yes, it must be a unanimous twelve person decision as to any answer you reach to that issue, whether it be Yes or whether it be No. It must be a unanimous twelve person decision.
>
> Does that answer your question?
>
> JUROR BASINGER: Yes, sir.
>
> One more question, if I may ask. If there is not a unanimous decision, what steps are taken then as to the paper? Unless I'm reading it wrong—the reason that I'm asking because the way that the question is stated I might look at it totally different than juror number one would look at it and that's the reason we came out to ask because we want to be sure of what we were reading.

THE COURT: Well, the answer is that it must be unanimous twelve person decision. If what you're saying is—you understand that it can't be a majority vote, it must be a unanimous twelve person decision. So I'm going to ask you to continue deliberations with that instruction in mind. Does that answer your question?

JUROR BASINGER: Yes, sir.

THE COURT: If you'll step back there and keep trying, please.

After the jury resumed deliberations and the court adjourned awaiting the jury verdict, defendant objected to the judge's instruction and indicated that if all the jurors do not agree on the answer to Issue Three, then the answer to that question is "No." Thus, a unanimous decision is not required to answer "no" to Issue Three. The colloquy continued:

THE COURT: The State need to respond to that?

MR. KENERLY: Your Honor, I think it's just a question of syntax. It's an awkwardly worded question. But if they're not unanimous then we would just say that they cannot answer that question, but not that they would answer it, No. They can only answer it Yes or No if they're unanimous in whichever way they decide.

MR. RUSSELL: Your Honor, if that was the case, we could just strike the word "unanimous" from Issue Three.

Your Honor, I know it's kind of convoluted but in more simple terms if they do not all agree, then they do not find Issue Number Three. If they do not all agree, they cannot answer Yes to Issue Number Three. But they don't all have to agree, No.

I believe that the foreman asked a follow-up question, what happens if we all do not agree or all cannot agree? I think that therein lies the answer. The answer is that if you don't agree unanimously, then the answer to the question is No.

THE COURT: That is a very interesting argument and I certainly see the logic in it, but I don't believe that's a correct statement of the law as it now exists. So until I see some definitive direction from a higher court, I would feel compelled to deny that motion or that request. I'll certainly note that objection for the record.

I believe that defendant's attorney correctly stated the law when he told the judge, "if they do not all agree, then they do not find Issue Number Three. If they do not all agree, they cannot answer Yes to Issue Number Three. But they don't all have to agree, No." Defendant's position is consistent with N.C.G.S. § 15A-2000(b) and

(c), the court's initial instruction in this case, and the instructions on the Issues and Recommendation as to Punishment form. Furthermore, defendant's position is not inconsistent with the federal or state constitutions, or any decision of this Court that I have been able to find.

The State contends that the question in this case is controlled by *State v. Green*, 336 N.C. 142, 443 S.E.2d 14 (1994). I find that *Green* is distinguishable from the instant case. In *Green*, the defendant was charged with first-degree murder of two persons. After deliberations, the jury asked: "Does [the jury] decision have to be unanimous on both recommendations?" *Id.* at 176, 443 S.E.2d at 35. This Court held that "[t]he trial court correctly informed [the] jury that any recommendation [it] made *as to sentencing* must be unanimous." *Id.* at 178, 443 S.E.2d at 35 (emphasis added). In *Green*, the jury was questioning whether it would have to be unanimous in its sentencing recommendations on each of the two murder charges. The correct answer was "yes"; the jury must be unanimous in its sentencing recommendation of life or death. However, the question in this case was not whether the sentencing recommendation must be unanimous but whether the jury must be unanimous in order to give a negative answer to Issue Three, an intermediate step the jury must take prior to reaching a unanimous sentencing recommendation. Accordingly, this case is not controlled by *Green*.

If the jury does not unanimously agree that the mitigating circumstances are insufficient to outweigh the aggravating circumstances, or if any member of the jury has a reasonable doubt as to whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances found by the jury, the answer to Issue Three is "no." To put it simply, *the jury must be unanimous to answer Issue Three "yes," but unanimity is not required to answer "no."*[1] "If the jury cannot, within a reasonable time, unanimously

1. The majority also seems to decide that the jury must be unanimous in order to answer "no" to Issues One and Four. As to Issue One, the majority's decision seems *contra* to (1) *State v. Kirkley*, 308 N.C. 196, 219, 302 S.E.2d 144, 157 (1983) ("The unanimity requirement is only placed upon the finding of whether an aggravating . . . circumstance exists."); (2) the North Carolina Pattern Jury Instruction, N.C.P.I.—Crim. 150.10 (1990) ("If you do not unanimously find beyond a reasonable doubt that one of these facts existed, you would answer Issue One-A 'No[.]' "); and (3) Justice Meyer's dissenting opinion in *State v. Hightower*, 331 N.C. 636, 648, 417 S.E.2d 237, 244 (1992) (Meyer, J., dissenting) ("I conclude that defendant is entitled to a new sentencing hearing based on the trial court's erroneous instruction that the jury could not reject the sole aggravating circumstance submitted unless the jurors *unanimously* agreed that the evidence presented did not prove the existence of the aggravating circumstance.").

agree to its sentencing recommendation, the judge shall impose a sentence of life imprisonment; provided, however, that the judge shall in no instance impose the death penalty when the jury cannot agree unanimously to its sentence recommendation." N.C.G.S. § 15A-2000(b).

In this case, the jury was given two alternative instructions upon which to base its decision: the initial correct instruction required the jury to be unanimous in order to find that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, while the subsequent instruction erroneously required the jury to be unanimous in order to answer the question in the negative. When a jury is given two alternative instructions upon which to base its decision, one of which is improper, the matter must be remanded for a new proceeding. *See State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987). This result is required because the appellate court cannot determine upon which instruction the jury relied in reaching its decision and, therefore, assumes the jury relied on the erroneous, improper instruction. *Id.* This Court is "not at liberty to" assume upon which instructions defendant's sentencing jury relied. *State v. Belton*, 318 N.C. 141, 162, 347 S.E.2d 755, 768 (1986). "[T]he Court [construes] the ambiguity in favor of defendant." *Id.* This is especially true where, as here, the erroneous instruction is given in response to a question, from the jury, which indicates that the answer to the question may determine whether defendant is sentenced to life imprisonment or death. Since the jury may have relied on the erroneous instruction to make its recommendation of a sentence of death, I cannot find the error harmless beyond a reasonable doubt. I would thus find the error prejudicial, vacate defendant's sentence of death, and remand the case to Superior Court, Cabarrus County, for a new capital sentencing proceeding in accord with N.C.G.S. § 15A-2000.

Justice WHICHARD joins in this concurring and dissenting opinion.